310-0148 Karen McCurrie v. Grove Dental Associates Good morning, Justices. My name is Dan Collins. I'm from the law firm of Crow Bond Journal and Given on behalf of Petitioner Karen McCurrie. Counsel, may it please the Court. Justices, I believe that the evidence in this case shows that the Commission's decision in not awarding a wage differential is against the manifest weight of the evidence. A man is a whole of word. The Commission increased it by 5%. The evidence that the Commission cites, too, clearly shows that my client suffered from permanent restrictions that prevented her from going back to her job, thereby fulfilling the first prong of a wage differential case as set out by the Court in Galliante. And then, with respect to the – and I should point to the fact that that statement by the Commission is despite the fact of the Section 12 Dr. Delheimer's opinions. With respect to the second prong of the wage differential case, the Petitioner's testimony was very clear that she had taken a second – or she had taken a new job and she had taken that job for $12.50 an hour. And the same day that she was taking this job as an ophthalmological assistant, and this was after doing a job search, that her employer called her up on that very same day and offered her a position as a receptionist at the exact same rate of pay. That rate of pay, $12.50 an hour, is less than what she was earning in her old job as a dental hygienist, thereby – Go ahead. Thank you for your time. thereby showing an impairment of earnings, the second prong of the wage differential. Well, the Commission felt that – the second prong is, as you know, an impairment in the earnings. They felt that the – your client presented insufficient evidence because the claimant must prove actual earnings for a substantial period after the – before the accident and after the claimant returns to work. But here the Commission noted that your client had not looked for any work since 2003, 2004, according to her two doctors. The hearing was held over four years after she resigned her position as an ophthalmological assistant. So how did she prove the actual earnings for a substantial period of time? Well, she worked for seven months at that lesser rate of pay. And I would, again, point out that that was a rate of pay that the employer had offered her the exact same job. At that point, I think it's the perfect synergy at that point, because you have both the employer and the employee agreeing on what her job capabilities are and what that rate of pay is. Now, the fact that she doesn't work after that is simply because at that point the doctors take her off of work and they begin to opine that she can't ever go back to work. So therefore, she's – Was it in the record as to what the terms of the 699 accident settlement was, what they were, what the terms of the settlement were? I don't think that was ever made part of the record. I know there were some questions about that June 99 accident, but the dollar amount was not made part of the record. So in this case, the simple facts of the matter are that all she has is the seven months of time that she worked to show what her work capabilities were, to show her impairment. My argument would be that once the employer had offered her a job at the same rate of pay and acquiesced to that rate of pay, that there's an obligation where the proof of the wage differential occurs right at that point in time. And they would then have an obligation to pay wage differential. Well, what is meant, you believe, is meant by the phrase under the case law, the client must prove actual earnings for a substantial period before the accident after he or she returns to work. Could somebody then just stay off, you know, for several years, get a job, and then let's say three weeks later they quit or something happens? How do you prevent that from happening? Well, I think that the commission will always look at the facts and circumstances surrounding that job. So if I'm an iron worker making $42 an hour and I sit off for a few years and then I go take a job at McDonald's at $8 an hour. And then you quit. And then I quit and say this is my entitlement to a wage differential, a rather substantial one, the commission doesn't have to accept that. They can say that you haven't truly proven what your work capabilities are. Certainly a respondent might come in with a labor market survey and some testimony indicating that, you know what, that person could make more. But I don't think the commission is stuck in that situation. They can look at everything. Isn't that what they did here? Well, no, I don't think so. I think the commission and the arbitrator made a ruling as far as a man-as-a-whole award, and I don't think that they went into deep analysis about a wage differential. I think they came to the conclusion that a man-as-a-whole was a more fitting award in this situation. And, you know, what I would just follow up with is that in that situation of the iron worker, if he had taken a job at $8 an hour and on that very day the employer called up and said, you know what, we've got a job for you back at our company and we're going to pay you $8 an hour, I think that's the best evidence of what that person's job earning capabilities are. And I think on that basis that would be enough for the commission to make that wage differential award. So I think that the ‑‑ based upon the evidence that's in this case, there's a clear entitlement to a wage differential award. In this case, the commission made an 8D2, a man-as-a-whole award. And, of course, that award says that that's appropriate if there's been a waiver of a wage differential, which my client never did in this case. So, therefore, I think that based strictly upon the act, also upon the Supreme Court's opinion in GE, that they have a preference for a wage differential over a specific loss award, that that would be the more appropriate award in this instance. Now, having said that, that is an argument based upon what the commission's rulings were, as far as her restrictions and the evidence as far as her loss of earnings. And there may be an opinion that I'm trying to get a second bite of the apple by arguing that she's entitled ‑‑ that she's actually a permanent and total disability. I've never felt that way. We submit the evidence to the commission. They've made their rulings. I have to accept that and make my arguments within that. But the fact of the matter is that in this instance, if the commission had just simply stopped and said, your client has suffered an aggravation of an underlying spondylolisis condition, and based upon that, we are making this award, I wouldn't be here arguing a permanent and total disability. Because at that point, we're just arguing about credibility of the witnesses, credibility of the medical testimony. But in this case, the commission goes further than that, because they then start talking about the fibromyalgia, which is the basis of our opinion that she's a permanent and total disability. And the commission goes on to say that they note that prior to this accident, she had had some conditions, headaches and things like that, and they go on to say that those were diagnosed in 2005 as fibromyalgia and chronic fatigue syndrome. Then the commission goes on further and talks about the inability to work as related to the non‑work‑related conditions of fibromyalgia, chronic fatigue syndrome and headache. So they've now thrown out there that my client, they found she suffers from fibromyalgia, and they're saying that that fibromyalgia condition has now affected her ability to work, but they've thrown out that, you know what, that's not work‑related. They found that it was not causally connected to the accident. Wasn't there also, wasn't it also a factor that there were, they felt there was numerous inconsistencies in the medical records that your client related? They certainly mentioned that in the decision, and I'm not here to downplay that by any stretch of the imagination. But I have to take a step back and ask, the question is, so what? And I say that because if you look at the medical opinions, when Dr. Kahle is, this evidence is brought to his attention, you know, were you aware of the fact that this client had had some of these complaints prior to this accident? And his answer is no. Would it have been important for you, making a diagnostic history? Sure, I would have liked to have known that. But ultimately, the question that gets asked of him is, does it change your opinion? And he says, Dr. Kahle says, well, it changes my opinion in that the accident may not have caused the fibromyalgia, but it would have at least aggravated a preexisting condition. So he's taken, where the commission has looked at these headaches and the conditions prior to the accident and said this is a big deal because of the inconsistencies, Dr. Kahle has looked at it and said, it doesn't change my opinion. Dr. Papernak has presented with a very similar situation. Isn't it true that, you know, you weren't really aware of these headaches? His testimony seems to indicate that, yes, it was, but maybe he hadn't really mentioned it in his medical records. Take it as it is. But Dr. Papernak says, with respect to the headaches, it's pretty much a nonissue. It's certainly a condition that can manifest itself in fibromyalgia, but it's not a requirement. But doesn't it get more basic than that? Are we glossing over the fact that there's credibility assessments involved? Didn't Kahle, wasn't he told by your client that she did not have any of these symptoms prior to the 2002 accident? And then he changed his opinion on causal connection because then we find out that she acknowledged, it's acknowledged later in other records, she did have all these headaches and fatigue. So doesn't it sort of undermine her credibility a little bit? Well, I guess the thing that I've kind of kicked around the most in the last few days with respect to this question of credibility of the petitioner is this isn't a case where they found her to be incredible and zeroed her out and made no award in the case. Instead, the arbitrator said, despite all of this stuff, she still suffered a compensable accident. She suffers a medical condition. Found that she has permanent restrictions that prevented her from going back to her job and made an award. So although the term credibility is thrown around, I don't see that it ultimately played a big factor in the commission's decision. Well, if the claimant says she's asymptomatic, she has no symptoms prior to the alleged accident at all. And then other medical doctors and other providers and people, she's saying she has suffered from all of these headaches and all these other severe symptoms. Isn't there sort of a problem with this? There would be if Dr. Kahle said, you know what, now that you've provided me with this information, I want to change my opinion completely here. Didn't he do that? Didn't he say that there was the accident December 10, 2002 did not aggravate the preexisting condition? Didn't he change it to come to that conclusion? Actually, what Dr. Kahle said was that knowing what he knew as presented to him in the course of the deposition, that that would change his opinion that the December 12, 2002 accident caused the fibromyalgia. But then he was subsequently asked and admitted that that would allow that it could have aggravated a preexisting condition. So, again, I'm saying to this Court, to me there's a big difference between the doctor completely backing off and saying, okay, basically I've been impeached, my opinion has been impeached, and it's being changed. And it's being changed in such a way that your condition does not relate to this accident whatsoever. It has nothing to do with this accident. And Dr. Kahle doesn't say that. He doesn't say that at all. And Dr. Papnak is presented with similar circumstances about the headaches. And what Dr. Papnak says is the headaches is, you know, a bit of a misnomer. It's not necessary for the diagnosis of fibromyalgia. The fact that she had them before, you know, it doesn't change the opinion about the diagnosis of fibromyalgia. And so what we're left with is in this opinion you've got the only medical evidence that sits out there are the opinions of Dr. Kahle and Dr. Lipov and Dr. Papnak that this person has fibromyalgia. And the commission, again, because they didn't just stop at your condition suffers from an aggravation of underlying spondylolisis. Because they went further and because they then started admitting she has fibromyalgia. And then they start saying, and the fibromyalgia predates her accident. Here's where the problem's at. So now we have to go back in and say, okay, well, what's the medical evidence? You know, if Dr. Delheimer, the Section 12 examination respondent it hired, had simply said, you know what, not a big fan of fibromyalgia. But I can tell you this, this person doesn't suffer from it. And here's the reason. You'll have time in rebuttal. Okay, thank you. Counsel, please. Good morning. May it please the Court. Counsel, my name is Bonnie Bijak and I'm here on behalf of Grove Dental as the appellee. I think one of the strongest issues that counsel brought up when he started talking about the wage differential and the prongs of it is that in order for the wage differential to come into effect as opposed to the decision that was a very by arbitrator Dollison and appelled by the commission is that the injury would have to actually cause her inability to work. In this situation, that's not the case. What she did sustain in December of 2002 was an aggravation of an underlying spondylolisthesis. There was determination that she could not return to work as a dental assistant, although she did go out and find a job at the eye doctor clinic for $12 an hour. But when she quit that job, she quit that job because of her alleged fibromyalgia and her chronic fatigue syndrome, saying because she had missed all the time for work. So we believe that the award of the arbitrator and the commission should be upheld. Other than the evidence that she worked this job at an ophthalmologist for a period of time, did the petitioner put any kind of evidence to show based solely upon the aggravation of her spondylolisthesis what kind of work she would be able to do? No. I mean, there wasn't anything else that they put in, was there? No. The only other documents that was admitted into evidence was a copy of a resume that she had submitted, you know, in that time frame when she was trying to get into, I believe it was eye school, ophthalmology school. Any other questions? I'll keep it very brief unless you have questions for me. Thank you, counsel. Thank you. Thank you, counsel. The court will take the matter under advisory for disposition.